IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

WESTERN DIRECTORIES, INC.,

    Plaintiff,

  v.

GOLDEN GUIDE DIRECTORIES, INC.; WEST COAST YELLOW PAGES, INC.; KEVIN TISDALE; MIKE MASON; and TROY OTUS,

    Defendants.

No. C 09-1625 CW

ORDER GRANTING PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

Plaintiff Western Directories, Inc. and Defendant Golden Guides Directories, Inc., which is owned by Defendants Kevin Tisdale, Mike Mason and Troy Otus, publish competing local telephone directories.  Plaintiff moves for a preliminary injunction prohibiting Defendants from, among other things, using Plaintiff's confidential information and making certain representations to Plaintiff's advertisers.  Mr. Tisdale and Mr. Otus oppose the motion.[1]  The matter was heard on May 21, 2009.

---

[1] Mr. Mason has not yet appeared in this action, and it is not clear whether he has been served.  Defendants Golden Guides Directories, Inc. and West Coast Yellow Pages, Inc. purported to file a joint answer with Mr. Tisdale.  "However, under a long-standing common law rule of procedure, a corporation, unlike a natural person, cannot represent itself before courts of record in propria persona, nor can it represent itself through a corporate officer, director or other employee who is not an attorney.  It must be represented by licensed counsel in proceedings before courts of record."  CLD Const., Inc. v. City of San Ramon, 120 Cal. App. 4th 1141, 1145 (2004); see also Rowland v. Cal. Men's Colony, Unit II Men's Advisory Council, 506 U.S. 194, 201-02 ("It has been the law for the better part of two centuries, for example, that a
(continued...)

Having considered oral argument and all of the papers submitted by the parties, the Court grants Plaintiff's motion.

BACKGROUND

Mr. Tisdale founded Defendant West Coast Yellow Pages, Inc. (West Coast) and is its majority shareholder. Under Mr. Tisdale's direction, West Coast formerly published community telephone directories in various markets in Northern California. In 2005, West Coast took out a loan from Wells Fargo Foothill, Inc. In exchange, Wells Fargo acquired a security interest in all of West Coast's assets, including its goodwill, trademarks and other intangible property. Gladstone Capital Corp. subsequently purchased the loan from Wells Fargo.

In late 2006, Mr. Tisdale took an extended leave from West Coast for personal reasons. According to him, West Coast's financial situation deteriorated in his absence and the company failed to print directories for which advertisers had already paid. West Coast defaulted on its loan and, in March, 2008, Gladstone exercised its right under the borrowing agreement to replace West Coast's directors, including Mr. Tisdale. Gladstone subsequently accelerated the amounts due under the borrowing agreement.

In August, 2008, Gladstone published notice that it would offer at public sale the West Coast assets in which it had a

---

[1](...continued) corporation may appear in the federal courts only through licensed counsel.") Mr. Tisdale's answer therefore does not constitute an appearance on behalf of Golden Guides Directories, Inc. or West Coast Yellow Pages, Inc. and, although these Defendants have since retained counsel, counsel has not yet filed an answer on their behalf. They are thus in default.

security interest.  Directories Holdings, Inc., a wholly owned subsidiary of Gladstone, purchased the assets at a public sale. Directories Holdings, Inc. immediately transferred the assets to Plaintiff.  Directories Holdings, Inc. owns fifty-one percent of Plaintiff's stock.  Plaintiff continues to publish directories, relying on West Coast's proprietary information and advertiser base to do so, and identifying itself on the directory covers as the "publisher of West Coast Yellow Pages."

Plaintiff alleges that, around the time Mr. Tisdale was removed from West Coast's board of directors, he obtained access to both electronic and paper West Coast files containing trade secret information.  In particular, Mr. Tisdale allegedly accessed a comprehensive database including West Coast's advertisers and the terms of the advertisers' contracts with West Coast.  An employee of Plaintiff's has submitted a declaration stating that Mr. Tisdale told him that he was able to remove from West Coast's offices a computer containing "everything he needed to run his new business". Jones Dec. ¶ 3.

Mr. Tisdale subsequently formed Golden Guides Directories with Defendant Mike Mason.  At an unspecified time thereafter, Mr. Otus purchased an interest in the company.  Golden Guides publishes community telephone directories and competes directly with Plaintiff.

Plaintiff alleges that Mr. Tisdale used the information he had accessed from West Coast to gain an unfair competitive advantage for Golden Guides at Plaintiff's expense.  Specifically, Plaintiff alleges that, shortly after leaving West Coast, Mr. Tisdale began

3

contacting Plaintiff's advertisers regarding their accounts, claiming that West Coast had been stolen from him and that Plaintiff was bankrupt and would take advertisers' money and not print directories. He allegedly urged advertisers to cancel their contracts with Plaintiff and purchase advertising in Golden Guides instead, which he represented was West Coast's replacement. Plaintiff also asserts that Mr. Tisdale sometimes referred to himself as "West Coast" or "West Coast Yellow Pages" when soliciting business, or otherwise led advertisers to believe that he was the publisher of West Coast Yellow Pages. In addition, Plaintiff asserts that the covers of the directories produced by Golden Guides imitate the physical design and appearance of those produced by Plaintiff.

Plaintiff claims that, because of Defendants' interference with its relationships with its advertisers and Defendants' misappropriation of its trade secrets, it has lost business and suffered pecuniary harm. Plaintiff asserts eight claims against Defendants: 1) unfair competition and false designation of origin in violation of the Lanham Act, 15 U.S.C. § 1125(a); 2) misappropriation of trade secrets in violation of California Civil Code §§ 3426 et seq.; 3) common law misappropriation of trade secrets; 4) tortious interference with contractual relations; 5) intentional interference with prospective economic advantage; 6) trade libel; 7) violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 et seq.; and 8) false or misleading advertising in violation of California Business & Professions Code §§ 17500 et seq.

4

On April 29, 2009, the Court entered a temporary restraining order prohibiting Defendants from:

1) accessing any database or other electronic file originating from a computer or server owned by Western Directories by virtue of its purchase of West Coast Yellow Pages, Inc.'s assets, or accessing any physical records originating from files owned by Western Directories by virtue of such purchase;

2) making any representations concerning Western Directories' financial condition or Western Directories' plans or business practices with respect to West Coast Yellow Pages, including but not limited to statements that Western Directories is going out of business or is no longer in business, that Western Directories is operating a "fraud" or a "scam," that Western Directories is taking advertisers' money and will not publish the promised directories or that Western Directories has failed to publish promised directories;

3) representing to advertisers that they are the successors of West Coast Yellow Pages; and

4) attempting to persuade Western Directories' advertisers to cancel contracts with Western Directories, to pull advertising from future Western Directories publications, to "renew" their West Coast Yellow Pages contracts by advertising with Defendants or not to pay Western Directories amounts due.

5

LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter v. Natural Res. Def. Council, Inc., ___ U.S. ___, 129 S. Ct. 365, 374 (2008). "[T]he required showing of harm varies inversely with the required showing of meritoriousness." Indep. Living Ctr. of S. Cal., Inc. v. Shewry, 543 F.3d 1047, 1049 (9th Cir. 2008) (quoting Rodeo Collection, Ltd. v. W. Seventh, 812 F.2d 1215, 1217 (9th Cir. 1987)). "When the balance of harm 'tips decidedly toward the plaintiff,' injunctive relief may be granted if the plaintiff raises questions 'serious enough to require litigation.'" Id. (quoting Benda v. Grand Lodge of the Int'l Ass'n of Machinists & Aerospace Workers, 584 F.2d 308, 315 (9th Cir. 1978)).

DISCUSSION

I.   Likelihood of Success on the Merits

Plaintiff argues that it has a strong probability of success on the merits of its claims for violation of the Lanham Act, misappropriation of trade secrets, trade libel and unfair competition.

A.   Lanham Act Claim

The Lanham Act prohibits a person from using in commerce:

> any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive as

6

>to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods . . . .

15 U.S.C. § 1125(a)(1)(A). The "ultimate test" under this provision of the Lanham Act is "whether the public is likely to be deceived or confused by the similarity of the marks." New W. Corp. v. NYM Co. of Cal., Inc., 595 F.2d 1194, 1201 (9th Cir. 1979).

Plaintiff has submitted several declarations from companies that advertised in West Coast. The declarations describe contacts between the companies and Mr. Tisdale in connection with Mr. Tisdale's attempts to persuade the companies to advertise in Golden Guides.[2] The declaration of Mike Alifano is illustrative in this respect. Mr. Alifano owns a business that purchased advertising space in the Half Moon Bay edition of West Coast Yellow Pages. According to Mr. Alifano, in June, 2008, Mr. Tisdale contacted him to urge him to stop payment for advertising in the upcoming edition of West Coast Yellow Pages. Mr. Tisdale stated that he was the "rightful owner" of West Coast, but that the company was going bankrupt and would not publish directories in the future, even though it was continuing to take deposits from advertisers. Mr. Tisdale brought a copy of the current edition of the Half Moon Bay West Coast Yellow Pages and explained that he was starting his own company that would publish similar directories. As a result of Mr. Tisdale's actions, Mr. Alifano became "confused as to the actual

---

[2] Plaintiff has also submitted a declaration from its CEO describing Mr. Tisdale's contacts with Plaintiff's advertisers. However, to the extent the CEO's knowledge of the contacts derives from conversations with the advertisers, the evidence is hearsay and is not considered.

7

status of the Half Moon Bay West Coast Yellow Pages" and was not sure "to whom [he] should direct any billing and advertising inquiries." Alifano Dec. ¶ 10.

Mr. Tisdale states that he has never represented himself as currently affiliated with West Coast, but rather has simply represented truthfully that he was West Coast's founder. Although it is not clear that Mr. Tisdale has made literal misrepresentations about his connection with West Coast, Plaintiff may be able to show that its advertisers were falsely led to believe that West Coast directories would be discontinued and that Golden Guides directories would replace them. In addition, the cover of the Golden Guides Half Moon Bay directory that was ultimately published is extremely similar in appearance to the Western Directories Half Moon Bay directory, a fact that is likely to contribute to advertisers' confusion. See Donlan Dec. Exs. M & N.

Although the ultimate likelihood of success on Plaintiff's Lanham Act claim will depend on evidence that is uncovered during discovery, the Court concludes that Plaintiff has established that serious questions exist regarding this claim.

B.  Misappropriation of Trade Secrets

To state a claim for misappropriation of trade secrets under California law, a plaintiff must allege:

> (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>
> (2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

8

> (A) Used improper means to acquire knowledge of the trade secret; or
>
> (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:
>
>> (i) Derived from or through a person who had utilized improper means to acquire it;
>>
>> (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or
>>
>> (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>
> (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Cal. Civ. Code § 3426.1(b). The term "improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Id. § 3426.1(a). The term "trade secret" is defined as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
>> (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and
>>
>> (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Id. § 3426.1(d).

Plaintiff argues that information concerning its advertisers constitutes a trade secret. It notes that, in Courtesy Temporary Service, Inc. v. Camacho, 222 Cal. App. 3d 1278, 1287 (1990), the California Court of Appeal found that a compilation of

9

"sophisticated customer information such as the key contacts within the customer's business, special needs and customer characteristics, workers' compensation information, billing rates, profit margins and other financial information" constituted a trade secret.  Id. at 1282.  The Camacho court held that a "list of customers or subscribers built up by ingenuity, time, labor and expense of the owner over a period of many years is property of the employer, and knowledge of such a list, acquired by an employee by reason of his employment, may not be used by the employee as his own property or to his employer's prejudice."  Id. at 1287 (internal quotation marks omitted).

While a simple list of Plaintiff's advertisers may not necessarily be a trade secret in that the identities of the advertisers could readily be determined by examining any directory, Plaintiff's advertiser database includes "the primary contact at each customer; the pricing, including any discount, for the customer's past contracts with Western Directories' competitors; the customer's payment terms; where and how frequently that customer has published advertisements in the past, including advertisements in other media; the customer's past complaints and requests; and the customer's personal information."  Donlan Dec. ¶ 14.  This type of information has independent economic value and, under Camacho, is a trade secret.

Defendants do not specifically deny that the information in Plaintiff's advertiser database is a trade secret.  Instead, Mr. Tisdale asserts that he did not access the files in question after he left West Coast.  Plaintiff counters that Mr. Tisdale previously

10

stated that he took a computer from West Coast containing "everything he needed to run his new business," and that he later requested the "master password" to the advertiser database. Plaintiff also notes that the contracts used by Golden Guides take the same form as the contracts used by West Coast when Mr. Tisdale worked there.

The Court cannot resolve these factual disputes in connection with the present motion. However, the evidence submitted by Plaintiff is sufficient to demonstrate that serious questions exist with respect to its claim for misappropriation of trade secrets.

C. Trade Libel

Under California law, a person commits trade libel when he or she publishes "matter disparaging the quality of another's land, chattels or intangible things, that the publisher should recognize as likely to result in pecuniary loss to the other through the conduct of a third person in respect to the other's interests in the property." Leonardini v. Shell Oil Co., 216 Cal. App. 3d 547, 572 (1989) (quoting Restatement (Second) of Torts § 626). Trade libel encompasses "all false statements concerning the quality of services or product of a business which are intended to cause that business financial harm and in fact do so." Id.

As noted above, Plaintiff has submitted declarations from its advertisers describing the negative statements Mr. Tisdale made about Plaintiff. Specifically, he told the advertisers that Plaintiff was taking their money with the intention of not publishing directories, was about to go bankrupt and had stolen West Coast from him. These statements do not appear to be true,

11

and a reasonable person would have realized that they would be likely to result in pecuniary harm to Plaintiff. Plaintiff has thus established that, at a minimum, serious questions exist with respect to this claim.

### D. Unfair Competition

The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. It incorporates other laws and treats violations of those laws as unlawful business practices independently actionable under state law. Chabner v. United Omaha Life Ins. Co., 225 F.3d 1042, 1048 (9th Cir. 2000). Violation of almost any federal, state, or local law may serve as the basis for a UCL claim. Saunders v. Superior Ct., 27 Cal. App. 4th 832, 838-39 (1994). This includes the commission of common law torts. CRST Van Expedited, Inc. v. Werner Enters., Inc., 479 F.3d 1099, 1107 (9th Cir. 2007). In addition, a business practice may be "unfair or fraudulent in violation of the UCL even if the practice does not violate any law." Olszewski v. Scripps Health, 30 Cal. 4th 798, 827 (2003). With respect to fraudulent conduct, the UCL prohibits any activity that is "likely to deceive" members of the public. Puentes v. Wells Fargo Home Mortgage, Inc., 160 Cal. App. 4th 638, 645 (2008).

For the same reason that there are serious questions going to the merits of Plaintiff's claims for violation of the Lanham Act, misappropriation of trade secrets and trade libel, there are serious questions going to the merits of Plaintiff's claim that Defendants have engaged in "unlawful" business practices under the UCL by committing these violations.

12

Plaintiff argues that Defendants have also committed "unlawful" acts by engaging in false advertising and by interfering with Plaintiff's contractual relations and prospective economic advantage. California's false advertising statute prohibits the dissemination of "untrue or misleading" statements in the course of advertising. Cal Bus. & Prof. Code § 17500. Intentional interference with prospective economic advantage "imposes liability for improper methods of disrupting or diverting the business relationship of another." Gemini Aluminum Corp. v. Cal. Custom Shapes, Inc., 95 Cal. App. 4th 1249, 1255-56 (2002). Interference with contractual relations is "a species of" interference with prospective economic advantage; it carries the extra requirement of "the existence of a legally binding agreement" between the two entities that share a business relationship. Kasparian v. County of Los Angeles, 38 Cal. App. 4th 242, 260-61 (1995). These three claims overlap to a great degree with Plaintiff's Lanham Act and trade libel claims, in that the same alleged conduct forms the basis for all of them. Defendants' alleged use of Plaintiff's marks and their alleged misrepresentations to Plaintiff's customers raise serious questions as to these three claims and, to the extent these claims serve as the predicate for "unlawful" conduct under the UCL, raise serious questions as to the UCL claim as well.

Finally, as explained above, Defendants' conduct may violate the UCL if it is "fraudulent" or "unfair," even if it is not "unlawful." Again, the analysis of whether Defendants' alleged conduct is fraudulent or unfair largely overlaps with the analysis of the merits of Plaintiff's other claims. False advertising, for

13

example, is by its very nature "fraudulent" under the UCL and is an "unfair" means of competition.  Thus, serious questions exist with respect to the "fraudulent" and "unfair" aspects of Plaintiff's UCL claim as well.

II. Irreparable Harm, Balance of Hardships and the Public Interest

The Court presumes that Plaintiff will suffer irreparable harm if its proprietary information is misappropriated.  See Lillge v. Verity, 2007 WL 2900568, at *7 (N.D. Cal.) ("[T]he risk of losing established customers to defendants' new business due to defendants' improper use of plaintiff's proprietary information would obviously create lasting, irreparable harm.")  And it is probable that Plaintiff will suffer irreparable harm if Defendants make misrepresentations concerning its business practices or otherwise interfere with its relationships with its advertisers. In fact, Plaintiff has submitted evidence that it has already lost business as a direct result of Defendants' conduct.

In contrast, Defendants would not suffer hardship if the Court entered a narrowly tailored injunction prohibiting them from employing unlawful means to compete against Plaintiff.  The balance of harms thus tips in Plaintiff's favor.

The public interest is not squarely implicated in this case, but it would not be against the public interest to issue a preliminary injunction.

III. Scope of the Injunction

Considering that Plaintiff has raised, at a minimum, serious questions going to the merits of its claims and has shown that it is likely to face irreparable harm if Defendants employ unlawful

14

methods of competition against it, the Court concludes that injunctive relief is warranted.

Plaintiff argues that, in addition to prohibiting the conduct described in the temporary restraining order that was previously entered, the Court should preliminarily enjoin Defendants from: 1) publishing any directory using any font or formatting for its title that is confusingly similar to the fonts and formatting that Plaintiff uses on its publications' front covers; and 2) contracting with any of Plaintiff's current or past Northern California advertisers, and from publishing in Plaintiff's Northern California markets.

With respect to the first request, the injunction proposed by Plaintiff is sufficiently narrow in scope so as to lend itself to enforcement and to encompass only conduct that would be prohibited by the Lanham Act. The Court will therefore grant this relief. The second category of additional relief requested by Plaintiff, however, is overbroad and would essentially shut down Golden Guides. Plaintiff may be correct that the damage done to its ability to compete cannot be undone, but it does not follow that the Court should wipe out Plaintiff's competition altogether. Moreover, an injunction that did so would alter the balance of hardships in a way that would increase the required showing of likely success on the merits. The Court will not grant this relief.

## CONCLUSION

For the foregoing reasons, the Court GRANTS Plaintiff's motion

15

for a preliminary injunction.[3]  Defendants and their officers, agents, servants, employees, attorneys and all others in active concert or participation with them ARE HEREBY RESTRAINED AND ENJOINED, pending the resolution of this action, from:

1) accessing any database or other electronic file originating from a computer or server owned by Western Directories by virtue of its purchase of West Coast Yellow Pages, Inc.'s assets, or accessing any physical records originating from files owned by Western Directories by virtue of such purchase;

2) making any representations concerning Western Directories' financial condition or Western Directories' plans or business practices with respect to West Coast Yellow Pages, including but not limited to statements that Western Directories is going out of business or is no longer in business, that Western Directories is operating a "fraud" or a "scam," that Western Directories is taking advertisers' money and will not publish the promised directories or that Western Directories has failed to publish promised directories;

3) representing to advertisers that they are the successors of West Coast Yellow Pages;

4) attempting to persuade Western Directories' advertisers

---

[3] Mr. Otus suggests that the parties be "mutually" enjoined from making representations about each other.  If Mr. Otus seeks such relief, he must file a properly noticed motion.  Furthermore, in the absence of a counterclaim against Plaintiff, an injunction against Plaintiff would not be appropriate.

16

    to cancel contracts with Western Directories, to pull advertising from future Western Directories publications, to "renew" their West Coast Yellow Pages contracts by advertising with Defendants or not to pay Western Directories amounts due; and

5)  publishing any directory using any font or formatting for its title that is confusingly similar to the fonts and formatting that West Coast Yellow Pages, Inc. or Western Directories have used on their publications' front covers, attached as Exhibit 1.

  Defendants shall immediately return to Western Directories all business information described above and surrender Kevin Tisdale's laptop to Plaintiff's counsel within seventy-two hours for complete deletion, at Mr. Tisdale's expense, of all files containing information belonging to Western Directories. The parties shall confer as to the most economical method of achieving this result. The parties shall attempt to resolve any dispute concerning whether particular files constitute Plaintiff's business information before seeking relief from the Court.

  The $5,000 bond that Plaintiff posted in connection with the previously entered temporary restraining order shall be applied to this preliminary injunction. No further bond is required.

  IT IS SO ORDERED.

Dated: 6/8/09

*[signature]*
CLAUDIA WILKEN
United States District Judge